UNITED STATES of America

v.

Leon BERKMAN, Defendant.

No. 66–CR–61.

United States District Court
E. D. New York.

Jan. 3, 1969.

Joseph P. Hoey, U. S. Atty., Eastern District of New York, for plaintiff; Denis E. Dillon, Asst. U. S. Atty., of counsel.

Nicholas Atlas, New York City, Atty., for defendant.

ZAVATT, Chief Judge.

The defendant was tried by the court, without a jury, pursuant to a stipulation in writing signed by the defendant, his attorney and the United States Attorney, dated and approved by the court September 16, 1968. Rule 23(a) of the Federal Rules of Criminal Procedure. The five count information charged the defendant with five violations of 26 U.S. C. § 7203, i. e., his knowing and willful failure to make an income tax return to the District Director of Internal Revenue for the Internal Revenue District of New York, at Brooklyn, New York, within this District or to any other proper officer of the United States for the

calendar years 1959 (COUNT ONE), 1960 (COUNT TWO), 1961 (COUNT THREE), 1962 (COUNT FOUR) and 1963 (COUNT FIVE)—the defendant having been a resident of Flushing, within this District during all of the times mentioned in the Information—although he received during those calendar years gross income of $26,295.82, $20,840.49, $20,538.40, $21,347.90 and $19,040.70, respectively.[1] The defendant stipulated, at the opening of the trial, that he earned most, if not all, of "his earnings in this country"; that he received "apparent gross income" during each of the years 1959 through 1963 in the sums stated in the Information and that he "failed timely to file returns of his income for the years mentioned in Counts 1, 2, 3, 4, and 5 of the Information." During the trial he admitted having received gross income during the said years as follows: 1959—$13,110; 1960—$19,525.83; 1961—$21,249.33; 1962—$20,491.13 and 1963—$20,437.17.

The court finds that (1) during all of the times stated in the Information, the defendant resided at Flushing, New York; (2) the defendant received gross income during each of the years 1959, 1960, 1961, 1962 and 1963 at least in the sums admitted by the defendant during the trial; (3) that the defendant was required to file income tax returns for each of said calendar years on or before April 15th of each succeeding year; (4) that the defendant failed to so file; (5) that, in fact, he has never filed an income tax return for any of the five years stated in the Information.

There remains only the question as to whether his failure to so file for each of said years was willful and knowing or whether it was due to ignorance, error, mistake or excusable negligence.

The defendant, now 52 years of age, received a degree of Bachelor of Science in Commerce from the University of Georgia in 1937. The required courses for this degree included Corporate Finance and a basic course in accounting. Upon his graduation, he joined his father in the metal business and remained in that business from approximately 1938 to 1954. Then he became a commission sales agent and in 1958 was placed in charge of the Domestic Department of Ufinindo, a department which sold automotive tubings, plumbing fixtures, etc., and compensated at a percentage of the profits earned by that department. This was a part-time job. He ceased this association in February 1960 but continued to receive commissions in 1961 and 1962 on material which he had purchased for Ufinindo prior to February 1960, which was sold by Ufinindo after the defendant ceased his association with that company. While defendant was associated with Ufinindo and in March

---

1. 26 U.S.C. § 7203:

"Any person required under this title to pay any estimated tax or tax, or required by this title or by regulations made under authority thereof to make a return * * * who willfully fails to * * * make such return * * * at the time or times required by law or regulations shall * * * be guilty of a misdemeanor * * *."

26 U.S.C. § 6012(a) (1):

"§ 6012. Persons required to make returns of income

(a) General rule.—Returns with respect to income taxes under subtitle A shall be made by the following:

(1) Every individual having for the taxable year a gross income of $600 or more (except that any individual who has attained the age of 65 before the close of his taxable year shall be required to make a return only if he has for the taxable year a gross income of $1,200 or more);"

26 U.S.C. § 6072(a)

"§ 6072. Time for filing income tax returns

(a) General rule.—In the case of returns under section 6012, 6013, 6017, or 6031 (relating to income tax under subtitle A), returns made on the basis of the calendar year shall be filed on or before the 15th day of April following the close of the calendar year and returns made on the basis of a fiscal year shall be filed on or before the 15th day of the fourth month following the close of the fiscal year, except as otherwise provided in the following subsections of this section."

1958, the defendant and two other persons formed Gregory Sales, in which defendant was an equal partner and to which he devoted only part of his time. Gregory Sales was merely a sales organization which located material (including copper tubing and pipes) at various places, including Ufinindo, for those who wished to purchase the same. The defendant was the expert on copper tubing who advised the partnership as to the quantities of copper tubing available and at what price. Ufinindo did business with Gregory Sales while the defendant was associated with Ufinindo but ceased so doing business in February 1960.

In 1960, the defendant entered into a five year contract with Winter, Wolff and Co. (Winter, Wolff), dated January 14, 1960, under which he was to receive 40%· of all net profits on copper and brass business he procured for the company, with a monthly drawing account of $1,250. The defendant was the sales manager of the nonferrous department of the Company. His duties included locating and purchasing nonferrous products throughout the country which the Company then sold to its customers. The Company had the right to cancel the agreement if the defendant failed to earn the amount of his drawings for two "subsequent six month periods." This agreement was cancelled by the Company on June 13, 1962 pursuant to this provision. But a new arrangement was continued to December 31, 1962, under which, in determining the 40% of profits to which defendant would be entitled for the year 1962, the losses of 1961 would be taken into account so that, in effect, the years 1961 and 1962 would "be considered jointly in regard to payments of 40%· of profits to you." For the period January 1 to May 31, 1963, the arrangement reverted to the terms of the original agreement. Nowhere in any of these agreements and arrangements was there a provision that the defendant was obliged to refund to the Company the excess, if any, of drawings over commissions earned. During

1960 through 1963 another person was in charge of the State Metals Department. In 1963 that Department suffered a loss; the man in charge was fired and the defendant put in charge under a new agreement dated February 21, 1964. Pursuant thereto, the defendant was engaged "as an independent representative, to supervise and sell for its State Metals Department" at 30% of the profits of that Department; the defendant was entitled to receive "as advances" $20,000 per year payable in equal monthly installments; he was obliged to reimburse the Company for a $30,000 loss as of February 1, 1964, which the Company carried forward, "out of his share insofar as it may exceed $20,000 in any one year." This agreement was to remain in effect for one year and thereafter, unless terminated by either party by notice on or after December 31, 1964. The defendant is still associated with Winter, Wolff and the department he manages (deemed essential by Winter, Wolff) is earning a good profit.

### 1959

The defendant received from Gregory Sales in 1959, as compensation for services and interest, the sum of $2,015.19 and a copy of the partnership information return prepared by the accountant for that partnership.

During the same year, he received from Ufinindo as commissions the sum of $18,775.14 in the form of eleven checks to his order.

### 1960

During 1960, the defendant received from Ufinindo, as compensation for services, the sum of $6,255.43 in the form of four checks to his order. One check, in the sum of $3,000 was endorsed to the order of North Shore Motor Sales Corp. for the purchase of Oldsmobile No. 407206519. Two checks totaling $3,000 were endorsed for deposit to the account which the defendant had opened in the name of his infant son, Jeffrey, with

the Manufacturers Hanover Trust Company, Main Street, Flushing, Long Island, New York, toward the end of 1958 or in early 1959 when Jeffrey was 18 years of age. It is noted that this son started to attend the University of Syracuse in 1958 where he continued in attendance through 1959; worked at the Tyler Camp for Boys in Wayne County, Pennsylvania, during the summer of 1959; worked for Winter, Wolff during the summer of 1960; transferred to the University of Pennsylvania from which he graduated in 1962 and is presently in the employ of Winter, Wolff.

During the same year 1960, the defendant received from Winter, Wolff eleven checks of $1,250 each (totaling $13,750) as advances against commissions, all of which were deposited in the said account which the defendant had opened in the name of his son Jeffrey.

### 1961

Pursuant to his agreement with Winter, Wolff the defendant received in 1961 five checks totaling $20,000 as advances against commissions, all of which were deposited in the same account which defendant had opened in the name of his said son.

During this same year Ufinindo paid to the defendant the sum of $538.40, as commissions, in the form of four checks, all of which were deposited in the said account.

### 1962

In 1962 the defendant received from Winter, Wolff, pursuant to the original agreement, two checks totaling $7,500 and four checks, pursuant to the new agreement, totaling $12,500 for the period June 13 to December 31, 1962. All six checks were deposited by the defendant in the said account maintained in his son's name.

During the same year the defendant received from Ufinindo in payment of commissions the sum of $1,347.90 in the form of six checks, each payable to the order of cash, in compliance with the request of the defendant made in December 1961.

### 1963

During 1963 Winter, Wolff paid to defendant, pursuant to its agreement with him, the sum of $19,040.70.

Winter, Wolff prepared a "U. S. Information Return" (Form 1099) for each of the years 1961, 1962 and 1963, reporting the commissions it had paid to the defendant during each of those years; delivered a copy of each to the defendant and mailed "a summary form" to the Internal Revenue Service. The defendant admitted having received these forms and testified that he took them into consideration in arriving at his conclusion as to whether he had *taxable income* for any of the years 1961, 1962 and 1963.

This is not the first time that the defendant has failed to file a return for a year in which he had gross income of $600 or more. He failed to file for the year 1954 during which he was President of Abco Smelting Company. When he was called in by the Internal Revenue Service for a conference on October 28, 1958, with reference to his 1954 income, he represented that he had filed a return and also an amended return for 1954 when, in fact, he had not so filed. He was represented by an attorney with reference to his 1954 income but dispensed with his services and appeared pro se before the Appellate Division of I.R.S. where the matter was settled on the basis of $7,600 income which the defendant conceded on August 15, 1962. On March 29, 1963, I.R.S. levied an assessment for tax, penalties and interest of $2,474.93. When the defendant was cross-examined at the trial about his involvement with the Internal Revenue Service with reference to his 1954 income, he was extremely evasive and exhibited a conveniently poor memory. He

pretended to have no recollection as to the time when he was interviewed by I.R.S.; not even whether the interview took place as recently as one month before this trial. Nor did he remember, so he testified, what the exact issues were.

The I.R.S. was investigating the defendant for failure to file returns for the years 1959 through 1963. On September 9, 1964, he appeared before a Special Agent who advised him that I.R.S. had no record of his having filed returns for the years under investigation. As he had done in 1954, the defendant stated that he had filed returns for each of the years 1959 through 1963 with the District Director of Brooklyn but did not have any retained copies thereof; that he had prepared the returns, some of which he had mailed from outside New York State. Six months later and on March 12, 1965, the Intelligence Division of I.R.S. notified the defendant by registered letter that its investigation was nearing completion; that it was considering a possible recommendation that criminal proceedings be instituted against him and offered March 25, 1965, as the date for a formal interview at which the defendant might appear with counsel or any other person of his choice.

The date of the interview was adjourned to April 2, 1965, at the request of the accountant, a Mr. Feldman, whom the defendant had consulted and retained some time after the meeting of September 1964. Mr. Feldman admitted that the defendant had never filed returns for the years in question. When the defendant was asked directly whether he had filed such returns, he refused to answer on the ground that his answer might tend to incriminate him. Asked why he maintained his bank account in his son's name, he replied that he did this in order to keep Internal Revenue from levying on his bank account. Asked about checks he received made payable to the order of Cash, his reply was that he did not want to discuss them.

Although he had stated on September 9, 1964, that he did not retain copies of the returns he then claimed to have filed, Feldman exhibited at the interview of April 2, 1965, what he represented to be the unsigned income tax returns prepared by the defendant for the years 1960, 1961, 1962 and 1963 prior to the date when they were required to be filed, but which had never been filed. At the trial, the defendant testified that he had prepared returns for each of the five years in question before their respective required filing dates and also identified what he represented to be his work sheets for each of the said so-called unsigned, unfiled returns. An examination of these "returns" and work sheets satisfy the court beyond a reasonable doubt that they were not prepared until after he met with a Special Agent on September 9, 1964. At the trial an effort was made to insinuate that these unsigned "returns" were filed at the April 2, 1965 meeting. The defendant's attorney argued that when the defendant's failure to file was called to his attention "he immediately came forth with all the evidence"; that this alleged filing (though admittedly tardy) should be considered as evidence that the defendant's failure to file when required lacked a bad purpose. The fact is that these so-called "returns" were never filed. They were merely exhibited in support of the contention that the defendant did not file because, as he had calculated, he had no taxable income during any of the five years in question.

The gist of defendant's explanation as to why he did not file returns for the Information years was that he believed that gross income meant taxable income; that although he had income far in excess of $600 each year he had no taxable income according to his method of calculation. He engaged in mathematical legerdemain in order to come up with no taxable income during each of the Information years.

On February 7, 1950, he acquired a taxpayer brick building formerly owned

by his father's A. Berkman Corp. free and clear of encumbrances. The revenue stamps on the deed in the amount of $5.50 indicate a purchase price of $5,000. Thereafter, he borrowed $12,500 secured by a first real estate mortgage and $10,000 secured by a second real estate mortgage. The premises were occupied by one tenant who paid a net annual rent of $2,400. The defendant lost the property in 1958 through foreclosure of one of the mortgages. This is how he claims to have computed the dollar amount of loss:

| | |
|---|---|
| Loss of net rental of $260 per month | $ 3,120 |
| Multiplied by 10 | 31,200 |

OR

| | |
|---|---|
| 2,500 square feet of building at $8 per square foot | $20,000 |
| Improvements (he added a rough figure) | 10,000 |
| | $30,000 |

He was very generous toward the Government. He claimed a loss of only $30,000, none of which he declared in 1958. In fact, he does not remember whether he filed a return for 1958.

He began taking this "loss" into account in computing his 1959 taxable income:

| | |
|---|---|
| Income | $ 1,310.00 |
| Expenses | $ 5,304.17 |
| Property loss | 30,000.00 |
| Personal exemption | 3,000.00 |
| Total deductions and exemptions | $38,304.17 |
| Loss to be carried over | $25,204.17 |

He continued this method of calculation for 1960, resulting in a loss carry over of $17,055.73 which he included in his calculation of deductions and exemptions for 1961 resulting in a loss carry over of $8,971.53 for 1962 which, together with other alleged deductions, plus personal exemption, produced a no tax result.

Having exhausted this source of substantial "deductions," he resorted to another example of mathematical legerdemain with reference to his 1963 income. He deducted from income received in that year the $30,000 which he might have to repay in the future pursuant to his agreement with Winter, Wolff, dated February 1, 1964, although it was not deductible from his drawings prior to the date of the agreement nor did the defendant claim that it was deducted from the income he received from Winter, Wolff prior to 1964. At the trial he also claimed that the money he received from Ufinindo during 1959, 1960, 1961 and 1962 was not income because it represented advances against profits of Ufinindo not then realized and that he might have to repay it. None of the money so received by the defendant was ever repaid nor has he ever been called upon to pay any part thereof. Asked at the trial when the money he received from Ufinindo became gross income, his reply was:

"Never. I can't answer that, your honor, I don't know how to answer that, your honor. All I can answer is on the basis of the facts."

In answer to a second similar question, his reply was:

"Never. I really don't know how to answer you. I really don't."

The defendant would have the court believe that he did not know the true meaning of gross income and that he was honest in his alleged belief that gross income means net taxable income as calculated by him; that if his computation indicated no net taxable income he honestly believed that he was under no duty to file a return.

For each of the Information years the defendant received from Internal Revenue Service a current individual Income Tax Form 1040 and Instructions Form 1040. The very first of the General Instructions in each of these Instructions Form 1040 reads as follows:

"WHO MUST FILE A TAX RETURN

Every citizen or resident of the United States—whether an adult or

minor—who had $600 or more gross income in [stating the year] must file; if 65 or over, $1,200 or more."

The defendant testified that he never read any Instructions Form 1040. Incredible!

It is passing strange that the defendant filed a return for 1956 reporting no tax due and filed a report for 1957 reporting no tax due. For these years he did not maintain that, because he felt he owed no tax, it was not necessary to file a return.

One of the exhibits offered by the defendant and received in evidence was a letter of his former attorney, Frank Serri, to the defendant's accountant, Isidore Feldman & Co., dated April 3, 1965:

"Dear Sirs:

This is to affirm that about the year 1959 I informed Mr. Leon Berkman of 150–02 77th Avenue, Flushing, Queens, New York, that under Section 6012(a)(1) of the Internal Revenue Code, every taxpayer whose gross annual income was $600 or more, was required to file an income tax return.

Very truly yours,

Frank Serri"

Having observed the defendant and heard his testimony during the trial, I do not believe his testimony. I find beyond a reasonable doubt each essential element of each of the crimes charged in Counts One, Two, Three, Four and Five of the Information—including a knowing and willful failure to file income tax returns for the calendar years 1959, 1960, 1961, 1962 and 1963.

The attorney for the defendant and the Assistant United States Attorney who tried this case on behalf of the Government are directed to confer with the court immediately upon receipt of a copy of this opinion and verdict to arrange a date for the appearance of the defendant before the court.